**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 14-24866-CIV-SIMONTON**

GISELA OROPESA,

      Plaintiff,

v.

NANCY A. BERRYHILL, Acting Commissioner
of Social Security Administration,

      Defendant.

_____/

<u>**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**</u>

      This matter is before the Court on cross-motions for summary judgment filed by Plaintiff Gisela Oropesa ("Plaintiff") and by Defendant Nancy A. Berryhill, Acting Commissioner of the Social Security Administration ("Defendant")[1].  ECF Nos. [21] [25]. Based upon the consent of the parties, the Honorable Kathleen M. Williams, United States District Judge has referred the matter to the undersigned to take all necessary and proper action as required by law, through and including trial by jury and entry of final judgment, ECF No. [9]. The summary judgment motions are now ripe for disposition.

      For the reasons stated below, the undersigned GRANTS the Plaintiff's Motion for Summary Judgment, ECF No. [21], and DENIES the Defendant's Motion for Summary Judgment, ECF No. [25]. The case is REMANDED to the Commissioner with instructions for the Administrative Law Judge ("ALJ") to assign a weight to the opinion of Dr. Lorello; assign a weight to the opinion of Dr. Feldman; re-evaluate the opinion of Dr. Levine; more fully develop the record as related to the Plaintiff's failure to seek mental health

---

[1]  On January 23, 2017, Nancy A. Berryhill replaced Carolyn W. Colvin as the Acting Commissioner of the Social Security Administration.  Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is automatically substituted as the Defendant in this case.

treatment because of her economic situation;  re-evaluate the opinion of Dr. Dergan; more fully explain the weight accorded to Dr. Feria; and present a new hypothetical to the vocational expert, if needed, in accordance with this Order.

I.    PROCEDURAL BACKGROUND

The Plaintiff filed applications for Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") benefits, claiming she was disabled as a result of a slip and fall on November 6, 2006.  (R. 288-307, 353-71)[2].  After her claims were denied at the initial and reconsideration levels of review, Plaintiff requested a hearing before an ALJ.  (R. 177-178).  On June 3, 2010, the first hearing was held, and a partially favorable decision for Plaintiff was rendered on June 14, 2010.[3]  (R. 62-83).  A second partially favorable decision, identical to the first with the only difference being an attached exhibit list, was filed on July 1, 2010.  (R. 100-25).[4]  On July 30, 2010, the Appeals Council of the Social Security Administration ("AC") granted the Plaintiff's request to review the decision of the ALJ, and remanded the case with instructions for the ALJ to more fully consider the opinion evidence of record and further evaluate the severity of both the Plaintiff's alleged mental impairments and her obesity. (R. 127-129). The ALJ held a second hearing on May 3, 2013, with all parties present including an impartial vocational expert ("VE"), Jennifer DeBury, who appeared telephonically.  (R. 17-41).[5]

---

[2] The letter "R," followed by a page number is used to designate a page in the Administrative Record, which is contained in ECF No. [11].

[3]  The ALJ determined that the Plaintiff was disabled from November 6, 2006, to July 18, 2008, based on the SSI and SSDI applications filed on April 20, 2007.  (R. 83).  The ALJ also found that Plaintiff experienced medical improvement, and was no longer disabled after the complications from her hip surgeries resolved on May 19, 2008.  (R. 82).

[5] The ALJ noted that while the matter was pending before the Appeal Council, the Plaintiff had filed new claims for benefits on June 21, 2011.  The ALJ considered the new

The ALJ rendered the third partially favorable decision on June 24, 2013, which found that:  (1) the date the Claimant was last insured for purposes of disability insurance benefits under Title II was December 31, 2010; (2) Claimant was disabled from November 6, 2006 through May 18, 2008 based on the SSDI application filed on January 23, 2007; (3) Claimant was disabled from November 6, 2006 to May 18, 2008 based upon her application for SSI filed on May 11, 2009; and (4) Claimant's disability ended May 19, 2008 due to improvement in her condition.  (R. 142-159).  The Appeals Council denied review on October 24, 2014.  (R. 1-8).  Having exhausted all administrative remedies, Plaintiff timely filed the pending Complaint seeking judicial review of the administrative proceedings pursuant to 42 U.S.C 405(g).

II.   **LEGAL ISSUES PRESENTED**

The Plaintiff filed a Motion for Summary Judgment with Supporting Memorandum of Law, alleging that the ALJ erred as a matter of law when he: (1) wrongfully held that the Plaintiff's physical and mental impairment had improved with no supporting medical evidence, and (2) did not present an accurate and sufficient hypothetical question to the vocational expert.  ECF No. [21].

The Defendant filed a Response and Cross-Motion for Summary Judgment addressing the arguments raised in Plaintiff's Motion.  ECF No. [25]. The  Defendant asserts that there is substantial evidence supporting the ALJ's evaluation of the medical opinion evidence and the ALJ's  finding that the Plaintiff improved after May 18, 2008. The Defendant further asserts that substantial evidence supports the  ALJ's conclusion that the Plaintiff's mental impairments caused only mild or moderate limitations.  ECF No. [25] at 5-9.  Finally, the Defendant argues that none of the examining physicians on whom Plaintiff relies made findings that would undermine the ALJ's decision.

application in connection with the remanded applications.  This procedural posture does not affect the analysis in this order.

### III.   PLAINTIFF'S BACKGROUND AND MEDICAL HISTORY

#### A.  Plaintiff's Background

The Plaintiff, a native of Cuba, was born on April 4, 1964, and came to the United States in 2000.  (R. 20). The Plaintiff received a twelfth grade Cuban education, but has not received any schooling in the United States.  The Plaintiff does not speak English and resides in Miami Dade County.  (R. 20). The Plaintiff has two brothers and a sister, and is the mother of an adult son.  (R. 794). The Plaintiff was employed primarily as cashier and counter clerk, and claimed that she stopped working because she became disabled as a result of a slip and fall that occurred at her condominium on November 6, 2006.  (R. 21, 560).

#### B.  Plaintiff's Brief Medical History

The Plaintiff is five foot one and weighed 220 pounds at the time of the June 3, 2010 hearing.  (R. 49).  The Plaintiff claimed to have been in relatively good health prior to her alleged disability onset date but following a slip and fall she underwent open reduction internal fixation on her right hip on November 7, 2006. (R. 554).  The surgery was successful and she was transferred to HealthSouth Rehabilitation.  (R. 573).  During rehabilitation, the Plaintiff complained of pain in the left hip region.  (R 573).

The Plaintiff was admitted to South Miami Hospital on November 21, 2006, where she was found to have a stress fracture of the left femoral neck.  (R. 593-595).  On November 24, 2006, the Plaintiff underwent a percutaneous screw fixation of the left hip. (R. 596).  Following the surgery, the Plaintiff was referred to HealthSouth Rehabilitation Hospital for rehabilitative care, but left against medical advice on December 6, 2006. (R. 598-9).

The Plaintiff continued to experience pain in her right hip despite orthopedic follow-up, physical therapy, and a home health aide.  On March 7, 2007, the Plaintiff was

4

admitted for preoperative evaluation for operative intervention for her right femoral neck fracture with conversion to a total hip arthroplasty. (R. 623). Dr. Jeffery Rich performed a right total hip arthroplasty that had some complications with penetration of the acetabulum in the medial wall, but was subsequently repaired by using autograft, which allowed the Plaintiff to have a stable fixation. (R. 642). The Plaintiff was discharged from South Miami Hospital on March 27, 2007. (R. 658).

On June 14, 2007, the Plaintiff returned to South Miami Hospital and underwent a left total hip replacement by Dr. Rich. (R. 688). The Plaintiff tolerated the procedure very well, remained medically stable, and was transferred for inpatient rehabilitation. (R. 691-92). The Plaintiff was discharged with First Care home care on June 29, 2007, and was to have physical therapy at home followed by outpatient therapy. (R. 703). In his follow up treatment notes dated October 8, 2007, Dr. Rich stated that the Plaintiff was doing well and without pain at that time. (R. 718). The incisions were reported to be well healed and the Plaintiff experienced no tenderness to palpation. (R. 719). However, Dr. Rich further noted that there was mild bilateral degenerative change of the hips. (R. 729).

On August 6, 2007, Dr. Roselind Horstman Bardisa at Kendall Medical Center completed a physical evaluation. (R. 741). Dr. Bardisa reported that the Plaintiff could not walk without a walker and was experiencing bilateral hip pain that limited her range of motion. (R. 742). Dr. Bardisa also completed a Physical Residual Functional Capacity Assessment in August 2007. (R. 766). The report stated that the Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk with normal breaks for about six hours in an eight-hour workday, sit less than about six hours in an eight-hour workday, and push and/or pull, including operation of hand and/or foot

controls unlimitedly.  (R. 767).  Dr. Bardisa also noted that Plaintiff's morbid obesity compounded her hip pains.  (R. 776). [6]

On July 23, 2011, the Plaintiff went to the emergency room at Baptist Hospital after she started to develop numbness in the left side of her face, neck, and left upper arm.  (R. 909).  The Plaintiff does not have a history of vascular problems, and denied any recent seizures, trauma, inability to produce words, visual loss, etc.  (R. 919).  The Plaintiff was discharged after staying overnight because her symptoms were improving.  (R. 910).  Dr. Roberto Sanchez stated in the consultation report that Plaintiff was most likely "having a complex migraine."  (R. 921).

In addition to her physical impairments, the Plaintiff has asserted that her mental impairments precluded her from working as of May 19, 2008.  The Plaintiff medical records as related to her mental health are outlined below.

IV.    Hearing Testimony

A.   Plaintiff's Testimony

The first administrative hearing was conducted on June 3, 2010, in Miami, Florida, attended by the Plaintiff, her counsel, and an interpreter.  (R. 42).  The Plaintiff, when asked by the ALJ why she stopped working, testified that she could no longer work because of a fall that she had in the condominium where she lived and the subsequent surgeries.  (R. 47).  She testified that she underwent four surgeries on her hips on November 6, 2006, November 21, 2006, March 14, 2007, and June 14, 2007.  (R. 47).  When asked how many pounds she can lift, the Plaintiff responded that she could lift no more than five pounds, and the most she had ever lifted while working for was up to twenty pounds.  (R. 49).

---

[6] Plaintiff underwent numerous evaluations and checkups following the four hip surgeries because she claimed to continue to experience pain, and suffer from depression as a result of her inability to function.

6

When examined by her attorney at the hearing, the Plaintiff testified that she continues to experience a pounding-like pain in her hips that goes down into her legs, and has affected her blood circulation.  (R. 49).  The Plaintiff testified that she takes Tylenol and Ibuprofen to deal with the pain.  (R. 50).  The Plaintiff also testified that she sometimes uses a cane when she has to walk long distances, but she avoids long walks because she is unable to do so.  (R. 50).  In addition, she uses the cart to support herself when she goes to the grocery store, and she stated that she cannot kneel or bend to the floor at all.  (R. 50-51). The Plaintiff further testified that she has to lie down four times a day on average for about fifteen to twenty minutes and sleeps on a recliner because she is unable to sleep on a bed due to pain.  (R. 52).  The Plaintiff started to cry at the hearing because of her current economic situation and her inability to return to work.  (R. 53). The Plaintiff testified that she tried to return to work in October of 2007, but was unable to continue because of her physical condition.  (R. 54). The Plaintiff stated that the only place she feels better is at home.  (R. 54).  When asked if she was dealing with depression, the Plaintiff stated that she had "no desire of anything," but she is not seeing any mental health professionals regarding her depression because she did not have any insurance or money and did not have a doctor. (R. 55-56).  She testified that she would see someone for her depression if she was able to obtain Medicare or Medicaid assistance.  (R. 56).

The second administrative hearing was held on May 3, 2013, in Miami, Florida attended by the Plaintiff, her counsel, an interpreter, and a VE, Jennifer DeBury, who appeared telephonically.  (R. 17).  The Plaintiff, when asked by the ALJ what keeps her from working, testified that she cannot work because of the four surgeries she had as a result of a slip and fall.  (R. 22).  The Plaintiff testified that the last time she had seen a doctor was in July, 2011 for ischemia, and that she did not see an orthopedic surgeon in

2011 or 2012.  (R. 22).  The Plaintiff testified that her condition worsened after her right and left hips were replaced.  (R. 26).  She stated that she has difficulty walking because her right side is shorter than her left side and she experiences a pinching like pain.  (R. 26).  The Plaintiff stated that she cannot do anything with her left hand, and that she has been suffering from paralysis in her left side since July 2011.  (R. 27-28).  The Plaintiff reported living with her sister and other family members.  (R. 30).  The Plaintiff testified that she is entirely reliant upon her family members, particularly her son, and she suffers from anxiety and depression because of said reliance.  (R. 30).  When asked by her attorney whether her emotional state had gotten better or worse two years her surgery, the Plaintiff replied that it was "worse."  (R. 31).  The Plaintiff testified that she takes Ambien for sleep, and tramadol and Tylenol for pain.  (R. 23, 29).

### B.  The Vocational Expert's Testimony

The ALJ posed the following hypothetical to the VE.

> [T]he Claimant is 49 years of age, and she has a twelfth grade education, but does not speak English.  She has a history of right hip total replacement.  Also, by the date last insured, she has a history of non-severe depressive disorder.  Two views of the hips on July the 17th, 2009 showed the position is satisfactory, satisfactory position and no fractures for these locations where noted.  Although, when she was examined in July the 26th, of 2011, the study showed that the bones and all components were within normal limits.  No fractures or dislocations were noted.  The physician, who examined, noted muscle strength of 5 over 5 on the right, and 4 over 5 on the left.  Also, he noted that intact grip (phonetic) on the right, and slightly decrease[d] on the left.  Also, she went on to the hospital on November 11, 2011, and specifically at page 7, I think it shows no evidence of acute cardiovascular disease, and at page 18, no evidence of acute intercranial bleed, well, brain CT.  Around a physical standpoint, the Claimant can do light work, lifting ten pounds frequently, and twenty occasionally.  She can walk, stand, or sit six hours each position, avoiding, of course, climbing ladders and scaffolds.  From a mental standpoint, and prior by the time last insured, she had mild ASR, mild social functioning, and mild attention concentration and pace. During the year 2011, she only saw doctors a couple of times,

> as she testified, and the record establishes.  During the year
> 2012, and '13, she as seen no doctors.  And now would you
> please identify work from the light and sedentary level,
> function and capacity for light work activity, avoiding
> climbing ladders and scaffolds, on the -- with a mild
> condition, can she do her past work?

(R. 33-34).

The VE responded, "Yes, the counter clerk and the store cashier."  (R. 35).  The

VE, after being asked for the work the Plaintiff could perform from the light and

sedentary level, testified that the Plaintiff could do light work as a laundry folder

or garment sorter.  (R. 35-36).  In regards to sedentary work, the VE testified that

the Plaintiff could perform the duties of a toy sports stuffer, a cuff folder, or a

table worker.  (R. 36-38).  The ALJ went on to pose the question again as to what

the jobs the Plaintiff could perform with the assumption that the claimant could do

light work, but from a mental standpoint, had a mild limitation in activities of daily

living, and "moderate limitations concerning socially and in attention and

concentration."  (R. 38).  The VE testified that the jobs Plaintiff could perform

would not change.  (R. 38).

   The Plaintiff's counsel then asked the VE whether or not the fact that

Plaintiff could only sit for two hours out of an eight-hour workday, she cannot

stand or walk at all in that workday, and she could not lift anything, would

preclude her from performing any of her past relevant work or any other jobs.  (R.

39).  In response to the question, the VE stated "yes, it would."  (R. 39). The

Plaintiff's counsel then cited to the findings of Dr. Randy Levine and presented a

hypothetical which included many more severe restrictions than the hypothetical

posed by the ALJ.  The VE  found that if Dr. Levine's limitations were found to be

present, the Plaintiff would not be capable of performing her past relevant work or

any other work.

V.    <u>STANDARD OF REVIEW</u>

Judicial review of the ALJ's decision in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's factual findings and whether the correct legal standards were applied.  42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Crawford v. Comm'r of Soc. Sec,.* 363 F.3d 1155, 1158 (11th Cir. 2004); *Martin v. Sullivan,* 894 F.2d 1520, 1529 (11th Cir. 1990).  "Substantial evidence" is more than a scintilla, but less than preponderance and is generally defined as such relevant evidence which a reasonable mind would accept as adequate to support a conclusion. *Lewis v. Callahan,* 125 F.3d 1436, 1440 (11th Cir. 1997); *Bloodworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

When reviewing the evidence, the Court may not reweigh evidence or substitute its judgment for that of the ALJ, and even if the evidence "preponderates" against the Commissioner's decision, the reviewing court must affirm if the decision is supported by substantial evidence.  *Barnes v. Sullivan,* 932 F.2d 1356, 1358 (11th Cir. 1991); *Baker v. Sullivan*, 880 F.2d 319, 321 (11th Cir. 1989).  This restrictive standard of review, however, applies only to findings of fact.  No presumption of validity attaches to the Commissioner's conclusions of law, which are reviewed de novo, including the determination of the proper standard to be applied in reviewing claims.  *Cornelius v. Sullivan*, 936 F. 2d 1143, 1145-46 (11th Cir. 1991) ("The Commissioner's failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal."); *Martin v. Sullivan*, 894 F.2d at 1529.

VI.     **FRAMEWORK FOR ANALYSIS**

The Social Security Act defines "disability" as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment."  42 U.S.C. § 423(d)(1)(A).  An individual "shall be determined to be under a

disability only if his  . . . impairment [is] of such severity that he is not only unable to do

his previous work but cannot, considering his age, education, and work experience,

engage in any other . . . substantial gainful work." 42 U.S.C. § 423(d)(2)(A).

The Social Security Administration applies a five-step sequential analysis to make

a disability determination.  20 C.F.R. § 416.920(a).[7]   However, if the claimant is found to

be disabled at any point in the process, the ALJ must also determine if the claimant's

disability continued through the date of the decision.  In order to find that the claimant's

disability does not continue through the date of the decision, the ALJ must show that

medical improvement has occurred which is related to the claimant's ability to work.  20

C.F.R. § 416.994(a).   In most cases, the ALJ must show that the claimant is able to

engage in substantial gainful activity, and in making this determination, the ALJ must

follow an additional eight-step evaluation process for the Title II claim and a seven-step

process for the Title XVI claim.  20 C.F. R.  § 416.994 and 20 C.F.R. § 404.1594.

Here, after determining that the Plaintiff was disabled from November 6, 2006

through May 18, 2008, the ALJ then determined that the Plaintiff had experienced medical

improvement and was no longer disabled.

---

[7]  **Plaintiff has claimed disability under both Title II, which governs disability insurance benefits and has insured status requirements, and Title XVI, which governs entitlement to Supplemental Security Income where the insured status requirements are not met. The same analysis is used under both Titles to determine whether a claimant is disabled, and identical regulations have been promulgated with respect to the disability determination.  In this Order the claims are treated together, and only the regulations applicable to Title XVI, contained in 20 C.F.R. Part 416, have been cited; the identical Title II regulations, contained in 20 C.F.R. Part 404, have been omitted.**

VII.    **THE SEQUENTIAL ANALYSIS PERFORMED BY THE ALJ**

Here, after determining that the Plaintiff was disabled from November 6, 2006 through May 18, 2008, the ALJ then completed the second sequential analysis and determined the following; (1)  beginning May 19, 2008, the Plaintiff had not had an impairment or combination of impairments that met or medically equaled the severity of one of the listings; (2) medical improvement occurred as of May 19, 2008, the date the Plaintiff's disability ended; (3) the medical improvement that occurred was related to the ability to work because there had been an increase in the Plaintiff's residual functional capacity; (4) beginning May 19, 2008, the Plaintiff has had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the claimant can lift and carry 10 [sic] pounds occasionally and 20 [sic] pounds frequently.  She can sit, stand and/or walk six hours in an eight-hour workday, but cannot climb ladders or scaffolds.  Mentally, the claimant has mild limitations in performing activities of daily living, moderate limitations in social functioning and moderate limitations maintaining concentration, persistence or pace; (5) beginning May 19, 2008, the Plaintiff was capable of performing past relevant work as a store cashier and counter clerk.

(R.151-158).

VIII.    **LEGAL ANALYSIS**

A.    **The Opinion Evidence of Record**

The Plaintiff asserts that the ALJ committed reversible error in finding that the Plaintiff's medical condition improved after May 19, 2008, ECF No. [21] at 6.   The Plaintiff asserts that the Plaintiff's chronic physical impairments continued to be disabling, ECF No. [21] at 7-10.  The Plaintiff also asserts that severe mental impairments imposed

marked limitations of function and precluded any work after May 18, 2008, ECF No. [21] at 11-26.

### 1.  The Framework For Analyzing Medical Opinions

An ALJ is required to consider and explain the weight given to different medical doctors such as treating, examining and consulting physicians.  *See McCloud v. Barnhart*, 166 F. App'x 410, 419 (11th Cir. 2006).  The opinion of a treating physician as to the nature and severity of an impairment is entitled to controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record.  20 C.F.R. § 416.927(c)(2).

The regulations also list the factors that the ALJ is to consider when weighing medical opinions. 20 C.F.R. §§ 404.1527(c), 416.927(c). Such factors include the treating and examining relationship, length of treatment, supportability, consistency, and specialization. *Id.*  In *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178-79 (11th Cir. 2011), the Eleventh Circuit Court of Appeals concisely set forth the following guidelines to apply in evaluating an ALJ's treatment of medical opinions:

> Absent "good cause," an ALJ is to give the medical opinions of treating physicians substantial or considerable weight. Good cause exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. With good cause, an ALJ may disregard a treating physician's opinion, but he must clearly articulate the reasons for doing so.
>
> Moreover, the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor. In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence.  Therefore, when the ALJ fails to state with at least some measure of clarity the grounds for his

13

decision, we will decline to affirm simply because some
rationale might have supported the ALJ's conclusion.

(internal quotation marks and citations omitted).

The ALJ is required "to state with particularity the weight given different medical

opinions and the reasons therefore, and the failure to do so is reversible error."  *Kahle v.*

*Comm'r of Soc. Sec.*, 845 F. Supp. 2d 1362, 1271 (M.D. Fla. 2012) (citing *Sharfarz v.*

*Bowen,* 825 F.2d 278, 279 (11th Cir. 1987)).  Additionally, the opinion of an examining

physician is generally entitled to more weight than the opinion of a non-examining

physician.  *Id.*

### 2.   The ALJ's Evaluation of the Medical Opinion Evidence of Record

#### a.   The ALJ'S Analysis of the Opinions Regarding the Plaintiff's Physical Impairments

The Plaintiff relies on three consultative examinations in support of her contention

that the ALJ erred in finding that her medical condition improved and she was therefore

not disabled after May 19, 2008.

##### i.    Dr. Joel Schapiro

The Plaintiff asserts that Dr. Schapiro imposed restrictions on the Plaintiff when

he recommended that the Plaintiff utilize a cane.  The Defendant asserts that the ALJ

reasonably found that Dr. Schapiro did not intend to impose actual limitations and that

Dr. Schapiro's findings do not undermine the ALJ's position.

On May 19, 2008, the Plaintiff was examined by Dr. Schapiro at the request of the

State Agency.  (R. 760-764).   Dr. Schapiro  found that the Plaintiff's, "tandem gait was

slightly unsteady.  X-rays of the left hip revealed a status post left total hip prosthesis in

satisfactory position and alignment and a status post right hip prosthesis also in

satisfactory position and alignment."  (R. 763).  Dr. Schapiro noted that the range of

motion regarding abduction of the right and left hips was limited to 15 and 20 degrees

14

respectively, and he diagnosed the Plaintiff with multiple arthralgias involving the hips and lumbar spine.  (R. 764).  Dr. Schapiro found that "a single prong cane may be helpful on an intermittent basis for exacerbation of pain."  (R. 764).  He found that that there were no limitations on the Plaintiff's abilities to get up from a chair, get on and off the exam table, walk to and heel, or in squatting and arising; although she was unable to hop on one leg.  (R. 763).

The ALJ outlined Dr. Schapiro's findings in his decision and stated "of note, no limitations were imposed.  (R. 153).  The ALJ failed to assign a weight to Dr. Schapiro's opinion.

The Plaintiff asserts that Dr. Shapiro placed a restriction on the Plaintiff by recommending that the Plaintiff use a cane.   The Plaintiff cites *to Walker v. Bowen*, 826 F.2d 996, 1003 (11th Cir. 1998) for the proposition that the need to use a cane to ambulate constitutes an impairment that is severe enough to preclude an individual from performing a wide range of sedentary work.   However, unlike the claimant in *Walker*,  Dr. Shapiro's report does not include any indication that the Plaintiff is unable to walk without an assistive device, but rather suggests that the use of a cane " may be helpful on an intermittent basis."   The Plaintiff did not raise the issue of the ALJ's failure to assign a weight to the opinion of Dr. Shapiro, however, the undersigned finds that a plain reading of Dr. Shapiro's report does not support the Plaintiff's assertion that Dr. Shapiro found that that a cane was necessary for the Plaintiff to ambulate, therefore any error for failing to assign a weight is harmless, except to the extent that the ALJ did not address why this opinion was apparently accorded greater weight than that of Dr. Lorello.

### ii.    Dr. Robert J. Lorello

On May 27, 2010, Robert J. Lorello, M.D., performed a physical examination of Plaintiff.  (R. 1040-1042).   At the time of the examination, the Plaintiff complained of

problems in the region of both her hips and pain in the region of the lumbosacral spine and cervical spine. (R. 1040). The physical examination included a cervical spine exam, a lumbar spine exam, a hip exam, and an exam of both knees. (1041-42). In the cervical spine exam, Dr. Lorello found that the Plaintiff had a limited range of motion and pain. (R. 1041). Dr. Lorello found in his lumbar spine exam of the Plaintiff that the Plaintiff had diffuse paraspinal muscular spasm with associated tenderness over the posterior elements. (R. 1041). Dr. Lorello additionally found that there was moderate limited flexion and extension and lateral bending in twisting were limited with pain present. (R. 1041).

Dr. Lorello  noted that the Plaintiff had difficulty ambulating and while she could toe or heel walk, she was unable to squat, and the range of motion of both hips revealed flexion to be present from 0 to 60 degrees, with rotation externally and abduction at 0. (R. 1042). Dr. Lorello also reported that the Plaintiff walked with the assistance of a cane. (R.1042).

The Plaintiff asserts that the ALJ failed to address Dr. Lorello's report in his decision finding that the Plaintiff was not disabled at the time. The Defendant argues that although the ALJ did not discuss Dr. Lorello's opinion, any error was harmless at it did not conflict with the ALJ's decision. While the Defendant is correct that such an error may be considered harmless if the opinion that was omitted was consistent with the ALJ's determination, that is not the case here. Dr. Lorello's report describes physical difficulties and limitations during the time period that the ALJ found that the Plaintiff was not disabled.  The ALJ erred by not addressing Dr. Lorello's opinion, and the case shall be remanded for the ALJ to consider Dr. Lorello's medical opinion and assign an appropriate weight.

16

### iii.   Dr. Michael Feldman

On July 26, 2011, Dr. Michael Feldman examined the Plaintiff at the request of the State Agency.  (R. 971-973).  Dr. Feldman found that the Plaintiff had antalgic gait due to bilateral hip pain and was unable to stoop, heel walk, or toe walk due to bilateral hip pain. (R. 972).   He noted that the Plaintiff walked without an assistive device. (R. 972).  Dr. Feldman found that the Plaintiff had "hip range of motions forward flexion 60 degrees, bilateral extension 20 degrees, bilateral abduction 20 degrees, bilateral adduction 10 degrees, bilateral internal rotation 20 degrees, bilateral and external rotation 40 degrees all with pain." (R. 972).  Dr. Feldman concluded in the Diagnostic Impression that, "Bilateral hip pain status post fracture, possible degenerative changes."  (R. 972).  In addition, he noted that Plaintiff has depression, insomnia, and a history of suicidal ideation without current treatment.  (R. 972). The attached X-Ray Report stated that the "bones and metallic components are within normal limits."  (R. 973).

Again, the ALJ discussed the opinion of Dr. Feldman but failed to assign a weight. The Plaintiff asserts that the report supports the Plaintiff's argument that that the Plaintiff's conditions had not improved to the point where she could return to work.  The Defendant asserts that substantial evidence supports the ALJ's finding that the Plaintiff's medical impairments showed medical improvements.

Given the limited review power of this Court, the undersigned will not re-weigh the evidence provided to the ALJ.  The ALJ does discuss Dr. Feldman's opinion and points to the portions of the report that support the ALJ's conclusion that the Plaintiff's medical impairments had improved.  (R. 154).  However, given that this case is being remanded on other grounds, the ALJ shall also reconsider the opinion of Dr. Feldman and clearly assign a weight to Dr. Feldman's medical opinion.

### b. The ALJ'S Analysis of the Opinions Regarding the Plaintiff's Mental Impairments

The Plaintiff does not challenge the ALJ's finding that she did not have a mental limitation prior to May 19, 2008, but instead asserts that her mental impairments worsened at that time and precluded any work after May 18, 2008, ECF No. [21] at 11-26. The Defendant asserts that the ALJ properly found that the Plaintiff was not disabled as a result of her mental impairments.  The ALJ considered the whether the Plaintiff's impairments resulted in at least two of the following: marked restriction of activities of daily living, marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of an extended duration.  (R. 152).  The Plaintiff asserts that the ALJ incorrectly determined that the Plaintiff had only mild to moderate restrictions in each of the "paragraph B" criteria outlined above.  The Defendant asserts that substantial evidence supports the ALJ's finding that the Plaintiff's mental impairments did not cause greater than mild or moderate limitations after May 18, 2009.  The undersigned will first address the ALJ's specific findings related to the "paragraph B" criteria and will then examine the medical opinions regarding the Plaintiff's mental impairments.

In his decision, the ALJ found that the Plaintiff had mild restrictions of daily living based upon a function report completed by the Plaintiff on December 14, 2011. (R. 515-526).  While it is not appropriate for the undersigned to re-weigh the evidence, a review of the function report shows that it does not amount to substantial evidence that the Plaintiff has only mild restrictions of daily living.  For example, the ALJ points to the fact that the Plaintiff spoke with family members daily as evidence that the Plaintiff only had mild restrictions in activities of daily.  (R. 152) However, a review of the report shows that the Plaintiff actually stated that she spoke to her family daily "but they do not understand

18

me." In the remainder of the function report, the Plaintiff stated that she does not prepare her own meals, needs reminders regarding her grooming and medication, and is afraid to go out alone. (R. 522). While there may be evidence in the record to support the ALJ's position regarding the finding of mild restrictions in activities of daily living, the above evidence cited by the ALJ fails amount to substantial evidence.

As related to social functioning, the ALJ points to the fact that the Plaintiff reported that she lived with family when seeking medical care and did not report any difficulties with the living arrangement, as evidence that she only has moderate limitations of social functioning. (R. 152). A review of the record referenced by the ALJ does not show whether the Plaintiff was even asked if she had any difficulties with the living arrangement but rather just reflects that she reported living in a house with a family member. (R. 1005). The ALJ also points to the fact that the Plaintiff interacted appropriately with her counsel and the court during testimony as evidence that the Plaintiff's limitations in social functioning were moderate. (R. 152). The transcripts reveal however that the Plaintiff in fact cried while testifying at both hearings. (R. 29, 53). The evidence referenced by the ALJ does not amount to substantial evidence to support the ALJ's conclusion that the Plaintiff has only moderate limitations in social functioning. The case shall be remanded for the ALJ to re-evaluate the evidence in light of the record as a whole.

In terms of concentration, persistence or pace, the ALJ found that the Plaintiff had moderate difficulties. (R. 152). The ALJ points to the Plaintiff's ability at the hearing to answer questions quickly and appropriately without evidence of memory or concentration problems. (R. 152). The ALJ also states that "the record shows that the claimant drove, shopped for groceries, went to the supermarket, spoke to family on a daily basis and visited her mother." (R. 152). A review of the record shows that in fact,

the Plaintiff reported at the hearing that she didn't drive and had difficulties interacting with her family.  (R. 23, 30, 32). Additionally, it is unclear to the undersigned how the referenced evidence related to speaking to family and grocery shopping could form the basis for an opinion as related to the Plaintiff's concentration, persistence, or pace.  On remand, the ALJ shall reconsider the record as a whole and provide more specific evidence to support the ALJ's decision.

Regarding the ALJ's finding that the Plaintiff has not experienced any episodes of decompensation of extended duration, the undersigned finds that this conclusion was supported by substantial evidence.

i.     Examination performed by Dr. Manuel Alvarez, Ph.D.

On September 8, 2008, the Plaintiff was examined by Dr. Alvarez after being referred by the medical disability examiner.  (R. 794-796).  Dr. Alvarez performed a mental status examination and found that the Plaintiff was cooperative and spontaneous. (R. 795).  He found the Plaintiff's affect to be constricted and her mood to be depressed.  (R. 795).  Dr. Alvarez stated that the Plaintiff was fully oriented to person, place and time, and her insight and judgment were reported to be intact.  (R. 795).  Dr. Alvarez found that the Plaintiff's attentions and concentration appeared intact and her intellectual functioning was found to be in the average range.  (R. 795).  Dr. Alvarez diagnosed the Plaintiff with major depressive disorder.

The ALJ assigned some weight to the determinations made by Dr. Alvarez "because they are supported by the remainder of the evidence, which shows the claimant should undergo mental health treatment."  (R. 157).  The Plaintiff does not specifically challenge the weight assigned to Dr. Alvarez.

ii.   <u>**Examination performed by Dr. Randy Levine, Ph.D.**</u>

On June 12, 2010, the Plaintiff was evaluated Dr. Levine at the request of her counsel.  (R. 866-882).  Dr. Levine completed a psychological evaluation report after administering a battery of psychological tests.[8] Dr. Levine reported that the result of the Beck Depression Inventory was in the severe range.  (R. 870).  Dr. Levine found the Plaintiff to be severely depressed, emotionally labile, and noted that she cried frequently during the evaluation.  (R. 871).  He noted that her sitting tolerance was limited to 20-30 minutes and the Plaintiff had to get up frequently throughout the process because of pain.  (R.871). He found the Plaintiff's pace of responding to questions was slow, and found her short term memory and remote memory to be fair.  (R. 871).  Dr. Levine stated in his report that the Plaintiff's auditory attention span was in the mentally defective range  and her abstract thinking was in the low-average range.  (R. 871).  The Plaintiff's insight was found to be fair and her intellectual function in was estimated to be in the low average range. (R. 871).   The Plaintiff scored in the impaired range for motor speed and Dr. Levine stated that "her ability to complete even simple tasks when there are other distracters around such as would be present in a work setting, is in the impaired range. Other than being slow, the claimant makes errors and becomes easily frustrated." (R. 873).   Ultimately, Dr. Levine found that the Plaintiff was not a malingerer and diagnosed her with major depressive disorder, severe, with some psychotic features.  (R. 876).  Dr. Levine also found that the Plaintiff would need a payee to manage any social security funds.  (R. 876).  Dr. Levine found that the Plaintiff had marked restrictions in activities of daily living, maintaining social function and maintaining concentration, persistence or pace.  (R. 881).  Dr. Levine concluded his report by stating that "with this level of severe

---

[8]  Specifically Dr. Levine completed a mental status examination , Beck Depression Inventory-II; General Personality Evaluations – MMPI; Pain Location and Intensity Body Map; Working Memory Index of the Weschsler Adult Intelligence Scale – IV Test ("WAIS-IV"); Trial Making Test; and the Rey Memory Test.

depression, severe chronic pain, limited functional tolerances, severe impairment in concentration, tendency to give up and not preserve on difficult tasks, the claimant could not be expected to work in a full time competitive employment setting."  (R. 877).

The ALJ provided a summary of Dr. Levine's report in his decision.  (R. 155).  However, the ALJ rejected the determinations made by Dr. Levine stating that

> The undersigned rejects the determinations made by Dr. Levine who evaluated the claimant at the request of her attorney.  Of note, his services were paid by the claimant's attorney.  Dr. Levine's determinations are not supported by clinical signs and findings and are based solely on the claimant's self-reports of disability.   Although testing indicated a severe level of her depression the undersigned again points out that the claimant has failed to undergo any mental health treatment.  This lack of treatment is indicative that her symptoms were not as severe as alleged.

(R. 156)

While the Defendant is correct in asserting that Dr. Levine's opinion are not entitled to controlling weight accorded to treating sources, the ALJ evaluation of Dr. Levine was flawed in that it incorrectly stated that the findings are "based solely on the claimant's self-reports of disability."  As outlined above, Dr. Levine completed a series of objective psychological tests and did not base his findings solely on the claimant's remarks. The ALJ's analysis of Dr. Levine's findings does not accurately portray how Dr. Levine made his findings and diagnosis.  As such, the case shall be remanded for the ALJ to more fully consider the opinion of Dr. Levine.

Additionally, at several points in his decision, the ALJ asserted that although the Plaintiff explained that her failure to seek mental health treatment was because she lacked financial resources, the ALJ believed the Plaintiff should have sought out free treatment that is available in Miami-Dade County.  (R. 155-6).   It is unclear what the ALJ relied upon in determining that the Plaintiff could obtain such services.  The ALJ infers that the Plaintiff's failure to seek out such treatment supports a finding that the Plaintiff

22

was not disabled.   However, while it is clear that the ALJ inquired of the Plaintiff at the hearings why she had failed to seek our medical treatment, the ALJ did not inquire whether the Plaintiff was aware of the reduced price services, nor did he direct her to such services.  (R. 31, 53).   The Plaintiff testified that she did not have insurance and could not afford treatment; and she had applied for Medicaid assistance and it had been denied.  She testified that she would seek mental health treatment if she was provided with Medicare or Medicaid assistance.  (R. 56).  Moreover, the record reflects that when she was admitted to Baptist Hospital in July 2011 due to a possible stroke, she had a high degree of anxiety and panic as well as a depressed mood and was referred for a psychiatric consultation (R. 920-21).   The Plaintiff specifically asked to be seen by a psychiatrist for her treatment for her depression.   (R. 910).   The ALJ erred by failing to develop the record as related to the Plaintiff's good cause for not seeking out medical treatment. *See Henry v. Comm'r Soc. Sec.,* 802 F.3d 1264, 1268 (11th Cir. 2015) (remanding case where ALJ failed to develop the record as related to the claimant's ability to pay for treatment); *see also Racine v. Comm'r of Soc. Sec.,* No. 1:13-cv-0127-csc, 2014 WL 4495220 at *12 (M.D. Ala. Sept. 12, 2014) ("the ALJ failed to follow SSR 80-59 when she neglected to inform Bulger about the free and reduced-cost treatment resources of which she claimed to be aware, to offer him an opportunity to use those resources, and to inform him about the consequences of his failure to do so.").

Because the ALJ failed to adequately develop the record regarding the Plaintiff's explanation for her failure to seek mental health treatment, such failure should not have formed the basis of the ALJ's decision to find that the Plaintiff was not disabled as the result of her mental impairments.  Therefore, the case shall be remanded for the ALJ to more fully develop the record as to this issue.

    iii.  <u>Dr. Jose J. Dergan, Psy.D.,</u>

   On May 1, 2013, the Plaintiff was evaluated by Dr. Dergan. (R. 1035-1038). Dr. Dergan performed a free drawing projective test, free word association test, house tree person projective test, thematic apperception test, Minnesota Multiphasic Personality Inventory, Beck Depression Inventory, and Beck Anxiety Inventory. According to Dr. Dergan, the Plaintiff appeared to be very labile and tearful, crying constantly as she described her condition. (R. 1036). Dr. Dergan completed a Mental Status Examination and found that the Plaintiff's short term memory was impaired, and she had poor levels of attention and concentration. (R. 1036). Dr. Dergan stated in his report that "data from various personality tests (objective and subjective) are indicative of an individual who appears to be emotionally labile, very depressed, rather exhibiting blunted affect and irritability when coping with even moderate stressful situation." (R. 1036). Dr. Dergan further found that there was evidence of a pattern of poor adjustment to daily living and at an interpersonal level the Plaintiff appeared to be socially isolated. (R. 1037). Ultimately Dr. Dergan diagnosed the Plaintiff with major depression recurrent with psychotic features and stated that the Plaintiff "appears to have an over-all psychological dysfunction characterized by severe depression, delusional thinking, a very tenuous reality testing and difficulty coping with daily problems." (R. 1038). Dr. Dergan concluded his report by recommending that the Plaintiff continue intense psychological and psychiatric intervention, finding that the Plaintiff "appears to be incapable of adjusting to even the simplest of activity particularly when social interaction is required." (R. 1038).

   The ALJ considered the report provided by Dr. Dergan, but the ALJ assigned his opinion little weight because the determinations were made "solely on the claimant's

self-reports of disability". (R. 157). The ALJ also found that Dr. Dergan's determinations were not supported by the remainder of the evidence.

A review of the record shows that in fact Dr. Dergan did not rely solely on the Plaintiff's self-reports of disability and therefore it was improper for the ALJ to reject Dr. Dergan's opinion on that basis. Furthermore, the ALJ again relies on the fact that the Plaintiff's treatment history does not reveal ongoing mental health treatment. As outlined above, because the ALJ failed to develop the record as related to the Plaintiff's inability to pay for mental health treatment, the lack of such treatment cannot form the basis for the rejection of Dr. Dergan's opinion. As such, on remand, the ALJ shall reconsider the opinion of Dr. Dergan.

### iv.   Dr. Paul A. Feria, Ph.D.

On August, 3, 2011, Dr. Feria, Ph.D., performed a psychological evaluation of the Plaintiff. (R. 976-979). Dr. Feria noted that the Plaintiff appeared to be somewhat listless and lethargic, as well as slightly flustered and irritable when asked to provide background information. (R. 976). Dr. Feria stated in the mental status assessment that the Plaintiff was emotionally tense, rather depressed and anxious. (R. 977). The Plaintiff indicated that she heard the voice of her mother constantly and sometimes had visions of her. (R. 977). The Plaintiff stated that she had thought of taking her own life and took three Ambien on one occasion during 2010. (R. 978). Dr. Feria found that the Plaintiff's ability to focus beyond herself was compromised and that the Plaintiff was very self-consumed. (R. 978). Dr. Feria diagnosed the Plaintiff with Depressive Disorder NOS and Anxiety Disorder NOS. (R. 979).

The ALJ accorded some weight to the determination made by Dr. Feria because it was "supported by the remainder of the evidence, which shows that claimant should undergo mental health treatment." (R. 157). It is unclear to the undersigned whether the

ALJ believes that Dr. Feria's opinion supports the ALJ's conclusion that the Plaintiff was not disabled as a result of mental impairments or whether it merely supports the opinion that the Plaintiff should seek mental health treatment. To the extent that the ALJ is asserting that the Plaintiff should seek mental health treatment, as outlined above, this issue needs to be developed more fully in light of the Plaintiff's explanation that she was unable to afford such treatment. Therefore, upon remand, the ALJ shall more clearly explain the weight accorded to the opinion of Dr. Feria.

### 3. <u>Hypothetical Posed to the Vocational Expert</u>

The Plaintiff asserts that the ALJ erred by not including all of the Plaintiff's impairments in the hypothetical posed to the VE, ECF No. [21] at 27-30].[9] The Defendant asserts that the ALJ properly declined to include limitations in the hypothetical that the records did not support. ECF No. [25] at 13.

The Defendant is correct that based upon the ALJ's determination that the Plaintiff did not have marked limitations as related to her mental capacity, he was not required to present a hypothetical that included such limitations. However, based upon the above analysis, it is the opinion of the undersigned that both the Plaintiff's mental and physical limitations should be reconsidered by re-evaluating the medical evidence of record. After conducting the re-evaluation as outlined above, the ALJ shall present a new hypothetical to the VE which incorporates all of the ALJ's findings.

---

[9] The Plaintiff also asserts that there were problems with the VE's telephone connection. As the case is being remanded to more fully develop the record, and pose a new hypothetical to the VE, it is not necessary for the undersigned to address this point in detail. The undersigned notes, however, that the transcript reflects the existence of serious problems with the telephone connection.

IX.     **CONCLUSION AND RECOMMENDATION**

Based on the foregoing, this Court finds that substantial evidence does not support the ALJ's determination that the Plaintiff was not disabled after May 18, 2008, Therefore, in accordance with the above, it is herby

**ORDERED AND ADJUDGED** that the Plaintiff's Motion for Summary Judgment, ECF No. [21], is **GRANTED**, and that Defendant's Motion for Summary Judgment, ECF No. [25], is **DENIED**.  This matter is **REMANDED** to the Commissioner pursuant to 42 U.S.C § 405(g), with instructions for the ALJ to assign a weight to the opinions of Dr. Lorello, Dr. Shapiro, and Dr. Feldman; re-evaluate the opinion of Dr. Levine; more fully develop the record as related to the Plaintiff's failure to seek mental health treatment because of her economic situation; re-evaluate the opinion of Dr. Dergan; more fully explain the weight accorded to Dr. Feria; and present a new hypothetical to the vocational expert, in accordance with this Order.

**DONE AND ORDERED** in chambers in Miami, Florida on March 31, 2017

*Andrea M. Simonton*

**ANDREA M. SIMONTON**
**UNITED STATES MAGISTRATE JUDGE**

Copies provided via CM/ECF to:
All counsel of record